

**RIKER DANZIG SCHERER HYLAND PERRETTI** LLP

ATTORNEYS AT LAW

Robert J. Schoenberg
Partner

Direct:
tel: 973.451.8511
fax: 973.451.8604
rschoenberg@riker.com
Reply to: Morristown

February 12, 2010

*Via Hand Delivery and CM/ECF*

Hon. Claire C. Cecchi, U.S.M.J.
United States District Court
M.L. King, Jr. Federal Courthouse
50 Walnut Street, Rm. 2064
Newark, NJ 07102

> Re: **Everett Laboratories, Inc. v. Rivers Edge Pharmaceuticals, LLC**
> Civil Action No. 09-3458 (JLL) (CCC)

Dear Judge Cecchi:

We represent the plaintiff Everett Laboratories, Inc. ("Plaintiff" or "Everett") in this matter, along with the Sheppard Mullin firm. This letter is in response to the February 10, 2010 letter (which we received February 11) from counsel for defendant River's Edge Pharmaceuticals, LLC ("River's Edge") in connection with Everett's second set of Requests for Admission to River's Edge. For the reasons explained below, Everett respectfully suggests that River's Edge's informal application for discovery relief is neither legally nor factually well grounded.

1. **Information and Documents Relating to River's Edge Coordination with Breckenridge Pharmaceutical, LLC**

A significant portion of River's Edge's February 10 letter seeks to avoid having to answer to Requests for Admission relating to the relationship between River's Edge and Breckenridge Pharmaceutical, Inc. ("Breckenridge"). River's Edge is not only trying to avoid having to respond to such Requests for Admission, but has also refused to provide any information or documents relating to its relationship with Breckenridge in response to Everett's other discovery requests. Specifically, Everett's Document Request Nos. 111-115 relate to River's Edge's relationship with Breckenridge, including, without limitation, "[a]ll documents and things relating to any agreement between [River's Edge] and Breckenridge." Request No. 115. On February 4, Everett's counsel held one of several meet-and-confer telephone sessions with River's Edge counsel on this subject and was in the process of writing to Your Honor on this very issue.

Headquarters Plaza, One Speedwell Avenue, Morristown, NJ 07962-1981 • t: 973.538.0800 f: 973.538.1984
50 West State Street, Suite 1010, Trenton, NJ 08608-1220 • t: 609.396.2121 f: 609.396.4578
500 Fifth Avenue, New York, NY 10110 • t: 212.302.6574 f: 212.302.6628
London Affiliate: 33 Cornhill, London EC3V 3ND, England • t: +44 (0) 20.7877.3270 f: +44 (0) 20.7877.3271
www.riker.com

Hon. Claire C. Cecchi, U.S.M.J.
February 12, 2010
Page 2

In any event, there is clearly no legitimate basis for River's Edge to bar all discovery into its relationship with Breckenridge to the extent that relationship involves Everett. Everett markets and sells, *inter alia*, prescription-only prenatal nutritional supplements after it has extensively researched and developed the formulation, and applied for and obtained patent protection from the U.S. Patent and Trademark Office. River's Edge and Breckenridge are different from Everett but similar to one another because they do not research or develop the prescription-only prenatal supplements they market and sell which compete directly with those marketed and sold by Everett. Instead, they wait to see if a product offered by Everett (or another patent holder) is commercially successful and, if it is, they aggressively enter the market with a lower-priced substitute (which of course can be lower priced because they expend nothing to research or develop the product). Moreover, they habitually enter such markets regardless of the patent, trademark or copyright protections possessed by Everett.

Everett believes in good faith, based on undisputed facts, that River's Edge and Breckenridge collectively view Everett as a competitor to pursue for their own profit and have coordinated their efforts to compete unfairly against Everett. Significantly, nowhere in its letter does River's Edge deny that it has coordinated activities with Breckenridge in connection with efforts to compete against Everett. Thus, it should be assumed that River's Edge possesses information relating to attempts to coordinate efforts with Breckenridge to compete against Everett. River's Edge merely does not want to produce such information in this case and is trying desperately to avoid doing so.

River's Edge asserts that any joint activities that it has engaged in with Breckenridge in relation to Everett are neither relevant nor genuinely calculated to lead to the discovery of admissible evidence in this case. However, in making this assertion, River's Edge ignores the fact that issues in the non-stayed portion of this litigation include:

1. Whether River's Edge acted *willfully* in infringing Everett's trademark rights in "Vitafol" by using "VitaPhil" to label and market River's Edge's generic prenatal nutritional supplement; and

2. Whether this case is "exceptional" under the Lanham Act because of bad faith, or malicious, fraudulent, deliberate or willful conduct on the part of River's Edge.

The Lanham Act provides that a successful plaintiff may recover, inter alia, the defendant's profits. 15 U.S.C. § 1117; Ramada Inns, Inc. v. Gadsden Motel Co., 804 F.2d 1562, 1564 (11th Cir. 1986). An accounting for profits may be appropriate where, inter alia, the defendant's conduct is a deliberate and willful violation. Howard Johnson Co. v. Khimani, 892 F.2d 1512, 1521 (11th Cir. 1990). In addition, in "exceptional" trademark cases, the court may award reasonable attorney fees to the prevailing party.

4017682.1

Hon. Claire C. Cecchi, U.S.M.J.
February 12, 2010
Page 3

15 U.S.C. § 1117(a). "A trademark case is exceptional where the district court finds that the defendant acted maliciously, fraudulently, deliberately, or willfully." <u>Stephen W. Boney, Inc. v. Boney Serv., Inc.</u>, 127 F.3d 821, 825 (9th Cir. 1997); <u>Ferrero U.S.A., Inc. v. Ozak Trading, Inc.</u>, 952 F.2d 44, 47 (3rd Cir. 1991) (a trademark case qualifies as "exceptional" where there is "bad faith, fraud, malice, or knowing infringement"). A court may find a case to be "an exceptional case warranting an award of fees under § 35(a) even absent willful infringement." <u>Securacomm Consulting, Inc. v. Securacom Inc.</u>, 224 F.3d 273, 279-81 (3rd Cir. 2000) (vexatious litigation may constitute an exceptional case, even if the act of infringement was not willful).

Certainly, if there is evidence that River's Edge has been working in tandem with Breckenridge to compete against Everett by introducing prenatal nutritional supplements that infringe Everett's patent, trademark and/or copyright protections, that would be evidence of "willfulness," bad faith, fraud, or malice, on the part of River's Edge which, in turn, could be relevant to the nature and amount of damages to be awarded Everett in this case. River's Edge is arguing in this case that its name "VitaPhil" does not infringe any trademark rights of Everett in "Vitafol." If trademark infringement is found, River's Edge can be expected to argue that such infringement was *accidental*. However, if there is a record of River's Edge aggressively competing against Everett – including an agreement with Breckenridge to work together to compete against Everett – that would be relevant to whether or not such infringement by River's Edge was, in fact, accidental.

The record that has been developed so far includes the following:

1. In early 2008, Everett filed a lawsuit in this Court against River's Edge alleging that River's Edge was liable for infringing Everett's U.S. Patent No. 6,814,983 (the "'983 Patent") in connection with sales of River's Edge's Verotin-GR and Verotin-BY prenatal nutritional supplements. <u>Everett Laboratories, Inc. v. River's Edge Pharmaceuticals, LLC</u>, Civil Docket No. 08-0075-KSH-PS (the "2008 Action"). River's Edge's Verotin products were direct competitors of Everett's Vitafol-OB products.

2. In June 2008, the parties entered into a settlement agreement which terminated that case. As part of that agreement, Verotin-GR and Verotin-BY could no longer be marketed or sold by River's Edge.

3. Also in June 2008, Everett discovered that Breckenridge had started to sell another product that competed directly with Vitafol-OB: Multifol. In August 2008, Judge Linares of this Court entered a preliminary injunction against Breckenridge's marketing and sales of Multifol. That preliminary injunction remained in place until the parties entered into a settlement agreement in May 2009.

Hon. Claire C. Cecchi, U.S.M.J.
February 12, 2010
Page 4

River's Edge apparently asserts that it was a *coincidence* that Breckenridge introduced a product to compete against Vitafol-OB immediately after River's Edge agreed to exit that market. However, the timing is hugely suspect. If there was no agreement between River's Edge and Breckenridge then why did Breckenridge start competing against Vitafol-OB once River's Edge was no longer able to do so? And, if there was an agreement between River's Edge and Breckenridge, did it predate River's Edge's commencement of its sales of "VitaPhil?"

Significantly, *River's Edge itself propounded broad document requests on Everett, seeking documents relating to Breckenridge*, that far exceed the scope of Everett's requests for admission. See Defendant's Request for Production Nos. 130 ("All communications with Breckenridge relating to Defendant."), 131 ("All communications with Laurence Runsdorf [Breckenridge's President], or any member of his family, relating to prenatal and/or postnatal nutritional supplementation."), 132 ("All communications with Laurence Runsdorf, or any member of his family, relating to either party.").

Ultimately, the fact remains that River's Edge chose to introduce a prenatal supplement produce called "VitaPhil" despite the preexistence of a prenatal supplement called "Vitafol." River's Edge should not be permitted to assert at trial that it had no intention of using "VitaPhil" to compete against Everett's sales of "Vitafol" (or to otherwise palm off on the goodwill associated with Vitafol) without allowing Everett reasonable discovery into River's Edge's sales and marketing strategy vis-à-vis Everett's products. If part of that strategy included coordination of efforts with Breckenridge for competing against Everett, River's Edge has no legitimate basis for refusing to allow Everett discovery into that issue.

2. **Information Relating to Other River's Edge Products Sold, Offered for Sale, Marketed, or Provided in Conjunction with Infringing VitaPhil Branded Products**

Everett's Request for Admission Nos. 184-193 relate to River's Edge Products that it sells, offers to sell, markets, and provides other River's Edge products "in conjunction with" the infringing and unlawfully competing VitaPhil branded products. This information is relevant and otherwise reasonably calculated to lead to the discovery of admissible evidence. Everett is seeking recovery of profits based on the amount of River's Edge's gross sales of its VitaPhil branded products, and is thus entitled to discover what sorts of direct or indirect "costs" River's Edge claims must be subtracted to calculate net profit. Further, if River's Edge piggybacks sales of its other products by using the infringing VitaPhil mark, Everett is entitled to damages based on these convoyed sales because Everett drove sales using the infringing mark, and possibly because the other products may displace other Everett products. If River's Edge did not convoy sales and promotion, it would simply deny these Requests.

Hon. Claire C. Cecchi, U.S.M.J.
February 12, 2010
Page 5

 

Significantly, River's Edge propounded many document requests on Everett, which impose far more burden than requests for admission, seeking documents relating to the same issue, and using the phrase "in conjunction with." See, e.g., Defendant's Request for Production Nos. 88 ("Documents sufficient to identify *any products or services* sold with or offered *in conjunction with* your Select-OB® product." (emphasis added)), 89 ("Documents sufficient to identify *any products or services* sold with or offered in conjunction with your VITAFOL® product."), 90 ("Documents sufficient to identify any products or services sold with or offered *in conjunction with* your VITAFŌL® product." (emphasis added)).

### 3. Complaints Relating to VitaPhil Branded Products and Other River's Edge Products

Everett's Request for Admission Nos. 194-203 are narrowly tailored, and ask River's Edge to admit that it has received complaints regarding its VitaPhil branded products and other prenatal and/or postnatal products. This information is relevant and otherwise reasonably calculated to lead to the discovery of admissible evidence. For example, if Defendant's VitaPhil branded products are inferior in quality to Everett's Vitafol branded products, Everett will be entitled to additional compensation for corrective advertising, and such quality issues would also support Everett's request for injunctive relief. To the extent that consumers are likely to confuse River's Edge and Everett generally due to Defendant's use of the infringing VitaPhil mark, and other of Defendant's products have quality problems, this harms Everett because such problems will be attributed to Everett. If River's Edge had not received any such complaints, it would simply deny these Requests.

Significantly, River's Edge propounded many document requests on Everett, which impose far more burden than requests for admission, seeking documents relating to Everett products not at issue in this litigation. See, e.g., Defendant's Request for Production Nos. 75 ("Documents and things sufficient to identify the wholesale price, retail price, suggested retail price, and/or revenue sharing plans for which you have offered your products that relate to prenatal and/or postnatal nutritional supplementation, including your Select-OB, VITAFOL and VITAFŌL products, from January 1, 2004 to date of response."), 88 ("Documents sufficient to identify *any products or services* sold with or offered in conjunction with your Select-OB® product." (emphasis added); see also, e.g., No. 41 ("All documents and things that *constitute, refer to, or reflect complaints* you have received from consumers about your VITAFOL® products." (emphasis added)).

4017682.1

Hon. Claire C. Cecchi, U.S.M.J.
February 12, 2010
Page 6

### 4. Admissions Regarding Food and Drug Administration Regulation

River's Edge alleges that Everett falsely advertises its Vitafol-OB product by truthfully stating that Vitafol-OB is "FDA regulated," on the attenuated theory that Everett is falsely implying that Vitafol-OB is approved by the FDA. Everett's Request for Admission Nos. 204-214 ask River's Edge to admit that River's Edge itself has represented that prenatal and/or postnatal products, including Defendant's prenatal and/or postnatal products, are regulated by the FDA, approved by the FDA, that Defendant's VitaPhil products have not been approved by the FDA, and that Everett's Vitafol branded products are in fact regulated by the FDA.

This information is relevant and otherwise reasonably calculated to lead to the discovery of admissible evidence. Any representations by Defendant that its non-FDA approved prenatal/postnatal products are regulated by the FDA would tend to undercut Defendant's argument that Everett's true statements constitute false advertising, and would also provide the basis for Everett to allege that Defendant has unclean hands. Further, Everett is entitled to clearly establish that its advertising is truthful and that prenatal/postnatal nutritional supplements are in fact regulated by the FDA. If River's Edge had not made damaging representations, it would simply deny these Requests.

Significantly, River's Edge propounded many document requests on Everett, which impose far more burden than requests for admission, seeking documents relating to representations that Everett's products are regulated or approved by the FDA. See, e.g., Defendant's Request for Production Nos. 66 ("All documents in which Plaintiff referred to any thing, activity, method, or process as 'regulated by' the United States Food and Drug Administration."); 67 ("All documents in which Plaintiff referred to any thing, activity, method, or process as 'approved by' the United States Food and Drug Administration."), 63 ("All documents and things that relate to any contracts, communications, and/or correspondence with the United States Food and Drug Administration regarding your VITAFOL product.").

### 5. Admissions Regarding Defendant's Lack of Good Faith Basis for Asserting Unclean Hands as to All of Everett's Claims

Everett propounded an interrogatory on River's Edge, requiring River's Edge to: "State all facts upon which you base your affirmative defense that Plaintiff's claims are barred by the doctrine of unclean hands...." Everett's Interrogatory No. 6. In response, River's Edge merely referred to its response to Everett's Interrogatory No. 5, which in turn relates solely to a patent related claim. Yet Defendant levels its affirmative defense of unclean hands against *all* of Plaintiff's claims. River's Edge must either state all facts supports its Federal Rule of Civil Procedure 11 basis for asserting unclean hands against each of Everett's claims, or withdraw the affirmative defense as to all non-stayed claims.

4017682.1

Request for Admission Nos. 215-217 ask River's Edge to admit that as of January 1, 2010, River's Edge "was unaware of any factual basis supporting its affirmative defense" that Everett's Fifth through Seventh Claims for Relief are "barred by the doctrine of unclean hands." *River's Edge does not even attempt to address these Requests in its letter brief.* If River's Edge could deny these Requests, it would have done so.

### 6. Admissions Regarding Use of Infringing VitaPhil Mark Prior to Date of Previous Settlement

In the first lawsuit against River's Edge, Everett and River's Edge executed a Binding Settlement Term Sheet, which included a release of claims, on May 23, 2008. River's Edge contends that this released any claims against it for use of the VitaPhil mark; however, Everett disputes that Defendant was using the VitaPhil mark at that time. Request for Admission Nos. 218-227 ask River's Edge to admit that it was essentially not using the VitaPhil mark prior to May 23, 2008, and that it does not have any documents evidencing any such use. This information could not be more relevant, and River's Edge does even attempt to argue that it is not. If River's Edge could deny these Requests, it would have simply done so.

### Conclusion

As explained herein, Everett's Second Set of Requests for Admission are highly relevant. See G.D. v. Monarch Plastic Surgery, P.A., No. 06-2184, 2007 U.S. Dist. LEXIS 5509, at ** 9-10 (D. Kan. Jan. 22, 2007) ("When the discovery sought appears relevant, the party resisting the discovery has the burden to establish the lack of relevance by demonstrating that the requested discovery does not come within the scope of relevance as defined under Fed. R. Civ. P. 26(b)(1), or (2) is of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad discovery." (internal quotations omitted)). "On motion to compel discovery or for a protective order, the party from whom discovery is sought must show that the information is not reasonably accessible because of undue burden or cost." See Major Tours, Inc. v. Colorel, Civ. No. 05-3091, 2009 WL 3446761, at *2 (D.N.J. Oct. 20, 2009). River's Edge has not even attempted to carry its burden. Accordingly, its request for relief from having to respond to Everett's Second Set of Requests for Admission should be denied.

Respectfully,

Robert J. Schoenberg

RJS/cm
cc: Counsel of record
(via CM/ECF)

4017682.1

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing document was electronically served upon all counsel of record by the court's CM/ECF system.

                                        RIKER DANZIG SCHERER HYLAND
                                         &PERRETTI LLP
                                        Attorneys for Plaintiff
                                        EVERETT LABORATORIES, INC.

                                    By: *s/ Robert J. Schoenberg*
                                             ROBERT J. SCHOENBERG

Dated: February 12, 2010.